Filed 8/26/24  P. v. Westby CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B325334 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA098097) |
| v. | |
| JUSTIN HEWITT WESTBY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelly M. Kelley, Judge.  Affirmed.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

# INTRODUCTION

Appellant Justin Westby was convicted by a jury of two counts of murder and one count of attempted murder; the jury found firearm allegations true. The court sentenced Westby to two terms of life without parole, a consecutive term of seven years to life, and additional consecutive terms based on the firearm allegations. Westby appealed.

On appeal, appellant's appointed counsel filed a brief and a supplemental brief requesting that this court independently review the record for error. (See *People v. Wende* (1979) 25 Cal.3d 436, 441 (*Wende*).) Westby also filed a supplemental brief. We have conducted an independent examination of the entire record and conclude no arguable issues exist. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The People charged Westby with the murder of Delroy Anthony Bogle (Pen. Code, § 187, subd. (a), count 1[1]), the murder of Marcus Anthony Blackman (§ 187, subd. (a), count 2), and the attempted, willful, deliberate, premeditated murder of M.C.[2] (§§ 187, subd. (a), 664, subd. (a), count 4.[3]) The information further charged a multiple murder special circumstance (§ 190.2, subd. (a)(3)), and firearm enhancements for all counts (§ 12022.53, subds. (b), (c), (d).) Westby pled not guilty and the case proceeded to trial in April 2022. The following evidence was presented.

---

[1]     All undesignated section references are to the Penal Code.
[2]     We refer to the surviving victim by initials to protect her privacy. (See Cal. Rules of Court, rule 8.90(b)(4).)
[3]     An unidentified count 3 was dismissed at the preliminary hearing. During trial, count 4 was referred to as count 3 in an effort prevent jury speculation about count 3.

1.    *The fight at Hungry Joe's*

On April 17, 2018, there was a fight at a restaurant called Hungry Joe's.  Information about the fight was presented to the jury in a recorded police interview of Westby that was played for the jury; the testimony of Everett Heard, Westby's cousin; the testimony of Christopher Campbell, a Hungry Joe's employee; and video of the incident shown at trial.

On April 17, 2018, Westby, Heard, and their friend Renisha went to get Jamaican food at Hungry Joe's, which was less than two miles from Westby's house.  Westby drove his own car— a 2014 charcoal gray, 4-door BMW—and Renisha drove her similar BMW with Heard as a passenger.[4]  Heard and Renisha went inside Hungry Joe's to get food; Westby waited in his car.

While Heard and Renisha were inside the restaurant, a female customer called Heard a "faggot" and other homophobic slurs.  Heard testified that he started to argue with the woman, but then backed off and "let Renisha do the talking."  Renisha and the woman argued.  The jury was shown video of the argument inside the restaurant and continuing as the women moved into the parking lot.

Campbell testified that he walked into the restaurant and found a man and two women arguing.  Campbell testified that as the argument moved outside, he also went outside in an attempt

---

[4]    Inglewood Police Department detective and investigating officer Luis Rodriguez testified that Renisha gave a statement to police shortly after the incident, but further efforts to interview her were unsuccessful.  He also testified that Renisha was never a suspect.  The prosecution presented video evidence that Renisha had been in the courthouse during the trial.

to defuse the situation.  Heard testified that there were also men "in the parking lot hanging out, and they started calling" Renisha names such as "bitch" and "hoe," and they also called Heard a "faggot" and other "gay slurs."  The woman who started the confrontation got in a car and left.  Campbell testified that Renisha remained in the parking lot shouting profanities, including saying, "I will blow this bitch up."

The argument in the parking lot caught Westby's attention, and he got out of his car to try to defuse the situation.  Westby said "a whole swarm of guys just came out" of the restaurant and told Westby, Heard, and Renisha to leave.  Heard went back into the restaurant to cancel the food order and get his money back.  Campbell testified that although Westby initially tried to calm Renisha down, he ended up joining the argument, which "got louder and louder."

A fistfight broke out; multiple people were involved.  Westby told police that the men pinned him down as they hit and kicked him.  Heard testified that as he walked out of the restaurant, he saw the group of men jump onto Westby.  Then someone hit Heard in the head with brass knuckles, which knocked him unconscious.  Campbell testified that the fight was short, and "just ended up dying out."  A video was played for the jury showing Heard unconscious and Renisha saying, "You're gonna get it, bitch."

After the men then backed off, Westby went to Heard, who was still unconscious, and dragged him to the car.  Renisha left on her own.  Westby dropped Heard off at his grandmother's house.

2.    *The shooting*

Later the same day, there was a shooting in the Hungry Joe's parking lot. M.C. testified that she and a friend, Peter, drove to Hungry Joe's on April 17, 2018. Peter went into the restaurant to get food while M.C. waited in the car. Peter came out of the restaurant with the food, but realized he had forgotten to get their drinks, so he went back inside the restaurant. M.C. continued waiting in the car.

M.C. heard shouting and looked up to see a man holding a gun. She ducked down in the car and heard the sound of shots being fired. M.C. was not hit. She testified that she and Peter panicked and drove out of the parking lot, but they stopped nearby and ended up talking to police.

Two men in the Hungry Joe's parking lot were killed. The jury was shown a photograph of the two victims in a Buick: Bogle in the driver's seat and Blackman in the passenger seat. Blackman was transported to the hospital but he did not survive. A pathologist testified that Bogle died from gunshot wounds to the head; Blackman died from a gunshot wound to the neck. Campbell testified that neither man had been involved in the earlier fight. Police found ten .223 caliber casings near the right rear of the Buick; there were multiple bullet holes and strike marks outside and inside the Buick. There were also bullet holes in M.C.'s car.

News of the shooting was broadcast that evening, including still photographs of Heard and Renisha taken from the restaurant's video. Heard testified that he saw pictures of himself and Renisha on the news saying that police were looking for them in connection with a shooting. Heard went to police the following day and told them about the fight.

3. *The investigation*

5

A video of Heard's interview with police was shown to the jury. Two days after the shooting, Westby also went to police; a video of his interview was played for the jury. Westby said that after the fight he took Heard to his grandmother's house, then went home and stayed home for most of the next two days. The detectives noted injuries on Westby's face from the fight and took pictures of them; the photos were shown to the jury. Westby said he went to the hospital to have his injuries checked and was diagnosed with a concussion. The detectives showed Westby part of the video of the fight from the restaurant, and Westby identified himself and Heard in the video. Westby told police he had a dark gray BMW. The detectives asked Westby if anyone else uses his car; Westby said no.

The jury heard a recording of M.C.'s interview with police from a few days after the shooting. The officers showed M.C. a photo six-pack that included Westby's photo; M.C. was not able to identify a suspect. M.C. testified at trial that she could not remember what she told police about the shooter's appearance, clothing, complexion, body, or the type of gun he was holding.

Kelly Robertson, who lived near Hungry Joe's, testified that on April 17, 2018, he noticed a charcoal gray, 4-door BMW parked on his street. The car had tinted windows. Robertson saw a man, whom he identified at trial as Westby, get out of the car, take a roll of tape from the trunk, and tape over the rear license plate. Westby got back in the car, which was facing east, and drove east.

Robertson later saw the same car drive west on his street. Robertson then heard gunshots, and he suspected they were related to the car. The car then passed his house again, driving east. Robertson called the police and reported what he saw and

6

heard.  Officers later came to interview him, and a recording of the interview was played for the jury.

On cross-examination, Robertson admitted that he told police he did not get a good look at the person who stopped in front of his house, he did not identify Westby from a six-pack of photos that officers showed him, and he did not positively identify Westby until the preliminary hearing.

Multiple videos were played for the jury that showed a gray BMW in the area of Hungry Joe's.  Within a span of about two and a half minutes, the gray BMW was visible, then gunshots were audible, then the BMW passed again.  The videos showed that the BMW had tinted windows, five-spoke rims, a sunroof, no front license plate, duct tape on the back license plate, and a sticker on the passenger side of the front windshield.

Police executed a search warrant at two locations on April 23, 2018.  Police impounded Westby's car—a 2014 charcoal gray, 4-door BMW with tinted windows, a sunroof, five-spoke rims, no front license plate, and a dealer sticker in the passenger side of the front windshield.  A roll of gray duct tape was in the trunk.

Police found Westby at one of the search warrant locations.  A box containing handgun parts (but no handgun) and a rifle bag (but no rifle) were found at the other location.  Mail addressed to Westby was found at both locations.  Cell phone records for Westby's phone number were presented to the jury, showing the location of cell towers used for phone calls throughout the day on April 17, 2018.

Renisha's BMW was located and photographed.  It was a similar model and color to Westby's, but it did not have a sunroof or tinting on the front windows.

7

4. *The defense*

The defense called an expert to testify about witness memory and accuracy.

5. *The verdict and sentence*

The jury found Westby guilty of two counts of first degree murder (counts 1 and 2) and one count of premeditated attempted murder (count 4).  For all three counts, the jury found true the allegations that Westby personally used and discharged a firearm (§ 12022.53, subd. (b) and (c)), and for the murder counts, that discharge of the firearm caused death (§ 12022.53, subd. (d)).  The jury also found true the multiple murder special circumstance (§ 190.2, subd. (a) (3)).

New counsel substituted in for Westby, and filed a motion for new trial on the grounds that prior counsel was ineffective and the verdict was against the weight of the evidence.  The People opposed the motion.  After a hearing, the trial court denied the motion.

The trial court sentenced Westby to life in prison without possibility of parole on counts 1 and 2, two consecutive terms of 25 years to life on the enhancements under section 12022.53, subdivision (d) on counts 1 and 2, a consecutive term of seven years to life on count 4, and a consecutive term of 20 years for the enhancement under section 12022.53, subdivision (c) on count 4.  The court awarded Westby credit for 1,687 days in custody[5] and imposed various fines and fees.  Westby timely appealed.

---

[5]    Appellate counsel notes that Westby was entitled to credit for 1,689 days of custody, and a motion to correct this error is pending in the trial court.

## DISCUSSION

On appeal, Westby's appointed counsel filed a brief requesting that we independently review the record for error. (*Wende, supra,* 25 Cal.3d 436, 441.) We directed counsel to send the record and a copy of the brief to Westby, and notified Westby of his right to respond within 30 days. Westby submitted a supplemental brief.

We granted appellate counsel's request to augment the record to include voir dire so counsel could consider potential violations of the Racial Justice Act (§ 745). Appellant's counsel then filed a supplemental brief invoking *Wende.* Again, we directed counsel to send the record and a copy of the brief to Westby, and notified Westby of his right to respond within 30 days. Westby belatedly requested additional time to file a second supplemental brief; he did not assert any reason or good cause for the request. We denied his request.

In his supplemental brief, Westby asserts several grounds of error: jury selection, ineffective assistance of counsel, the judge and the prosecutor's friendship, and a subpoena relating to a witness who was not called to testify. We address each of these issues below.

1. *Jury selection*

Westby contends that "a great number of prospect[ive jurors] individually made comments using racial bias, hatred, and prejudice; expressing hatred for black people. The majority of the prospective jurors felt this way and clearly used their right to express themselves." Westby asserts that his trial counsel dismissed these concerns. Westby also contends, "I had very little say in the jury selection process. I did not have a say in whom I choose [*sic*] to work with or not."

9

Westby's claims of prospective juror bias are not supported by the record. A single prospective juror said during voir dire that due to "a lot of bad experiences with African-American people," he felt that he could not be a fair juror. This prospective juror was dismissed and did not serve on the jury. No other prospective jurors expressed bias, hatred, or prejudice.

The record also does not support Westby's contention that he was not sufficiently involved in the jury selection process. Westby appeared with his counsel every day at trial, and the record reveals no impediments to communication between them. In denying Westby's motion for a new trial, the trial court observed that Westby and his counsel met in lockup before and during the trial, and that defense counsel had "an exceptional rapport" with Westby and his family members who attended the trial. Thus, nothing in the record suggests that Westby was improperly prevented from participating in the jury selection process with his counsel.

2. *Ineffective assistance of counsel*

Westby asserts that his counsel asked the trial court "for permission to spend the 1 hour lunch break to create the entire closing statements to only produce a 3-slide powerpoint in which he was presenting the same day." "To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.)

10

Westby's argument echoes the contention in his motion for a new trial that his trial counsel's closing argument was "grossly ineffective." In denying that motion, the trial court disagreed with Westby's contention, stating that defense counsel "always appeared exceptionally prepared and well versed on the issues," and "he advocated fiercely for his client, including during closing arguments." We agree that the closing arguments indicate that defense counsel was very familiar with the evidence presented at trial and argued competently on Westby's behalf. To the extent that any PowerPoint display was hastily crafted over a lunch hour, it did not appear to detract from the arguments presented.

Westby also asserts that the prosecutor "used my attorney['s] Microsoft Surface tablet numerous times to makes [*sic*] entries. All the while [defense counsel] was having an open dialogue with Chelsea & Mark via text containing progress of trial and strategy." Westby does not explain the identity or roles of Chelsea or Mark.

We find no error. No objections were made during trial about the use of any particular technology or piece of equipment. To the extent Westby is suggesting that his counsel revealed privileged information to the prosecution, nothing in the record supports such a contention. There was no indication that the prosecution discovered new evidence or changed strategy during the trial based on new information learned, for example.

3.     *Relationship between the prosecutor and the judge*

Westby also states in his supplemental brief that the judge and the prosecutor knew each other. Before the trial began, the judge noted that she knew the prosecutor. The judge noted that she and the prosecutor were former colleagues from when the judge worked at the District Attorney's office, they were friends

11

on Facebook, and she had endorsed the prosecutor in his candidacy for a judge position. The judge stated that their relationship would not affect her ability to be fair and impartial. Defense counsel said he had no concerns about getting a fair and impartial trial. Two days later, the judge noted that she had unfriended the prosecutor on Facebook out of an abundance of caution. Again defense counsel had no objection.

Westby states in his supplemental brief, "My attorney chose to proceed" despite the judge's relationship with the prosecutor. Again, we see no error. The relationship was fully disclosed, defense counsel had the opportunity to object, and defense counsel chose to proceed. By not objecting or moving to disqualify the judge, Westby has forfeited any claim that his statutory rights under Code of Civil Procedure section 170.1 were violated. (*People v. Peoples* (2016) 62 Cal.4th 718, 786.) Moreover, nothing in the record suggests that the judge demonstrated actual bias toward the prosecution or was otherwise inappropriate in her handling of the case. (See *id.* at p. 788 [actual bias may be demonstrated where, based on an objective assessment of the circumstances of the particular case, there is a probability of actual bias].)

4.      *Subpoena of a witness*

Westby states in his supplemental brief, "A friend of the family voluntarily served a subpoena to a helpful witness. The court received the subpoena and allowed the witness to testify. Moments later the attorney went on record and announced that he would not be using the witness [because] he will not be of any benefit to me."

Westby's supplemental brief does not include any citations to the record, and the identity of this potential witness is unclear.

12

Westby has also provided no information about what testimony the witness would provide or how the testimony would help his case. Westby has therefore failed to demonstrate any error relating to this witness.

5.    *Case quotes*

Westby includes in his supplemental brief several quoted statements from the reporter's transcript. He does not explain why these passages are quoted, nor does he make any argument relevant to the quotes. We have reviewed the entire record, including the portions of the record that contain the quoted statements. The quoted statements do not suggest any error.

We have examined the entire record and are satisfied no arguable issues exist in the appeal before us. (*Smith v. Robbins* (2000) 528 U.S. 259, 278; *People v. Kelly* (2006) 40 Cal.4th 106, 110; *Wende, supra*, 25 Cal.3d at p. 443.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P. J.

We concur:


MORI, J.


ZUKIN, J.

13